_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

APR 2 9 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND NORTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF: | ) ) ) |
| LEONARDO RAMOS LUCERO, | ) ) ) ) ) |

Filed Under Seal

Magistrate No. **14 - 1 0 0 9 BPG**

### COMPLAINT FOR ARREST FOR THE PURPOSE
### OF EXTRADITION PURSUANT TO 18 U.S.C. § 3184

I, Judson T. Mihok, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I act for and on behalf of the Government of Mexico ("requesting state");

2. There is an extradition treaty in force between the United States and Mexico, 31 U.S.T. 5059; TIAS 9656 (attached as Exhibit 1);

3. In accordance with Article 1 of the extradition treaty, the Government of Mexico has asked the United States, through diplomatic channels, for the arrest of LEONARDO RAMOS LUCERO, for the purpose of extradition;

4. According to the information provided by the requesting state in the form authorized by the extradition treaty, LEONARDO RAMOS LUCERO, (hereinafter "RAMOS LUCERO"), is charged in the State of Baja California with Aggravated Homicide, as defined by Articles 147, 148, 150 and 151 of the Penal Code of the State of Baja California. On January 13, 2006, the

Third Judge of the First Instance for Criminal Matters of Ensenada, in the State of Baja California, issued an arrest warrant for RAMOS LUCERO, as part of Criminal Case Number 04/2006.

5. As set forth in Diplomatic Note 05106 (attached as Exhibit 2), dated August 6, 2012, and supplemented by information provided to the United States Department of Justice by authorities in the Procuraduría General de la República (Attorney General's Office) of the United States of Mexico, the facts of the case for which extradition is sought are as follows:

On January 2, 2006, in the Municipality of Ensenada, Baja California, Mexico, RAMOS LUCERO, a United States Citizen, and Erik Francisco Torres Moreno killed Klaus Michael Aldama Perez by inflicting deadly injuries to his chest and abdomen with a bladed object.

In a sworn statement dated January 2, 2006, Francisco Geovani Arellano Almazan, (hereinafter "Arellano Almazan"), stated that on January 2, 2006, at approximately 8:20 p.m., he and his friends Jose Margarito Veliz Dominguez and Gabriel Lozano Rodriguez went to play soccer at a park located between Diamante and Mexico Streets in Ensenada, Baja California. Arellano Almazan stated that he noticed that an unknown male and an unknown female were also at this location. At the park, the unknown individuals later identified as Klaus Michael Aldama Perez (hereinafter "Aldama Perez"), and his former girlfriend, Roxana Adelina Hinojosa Ramos (hereinafter "Hinojosa Ramos"), walked into the playing area and began to talk. Arellano Almazan and his friends were able to see everything since they were sitting next to the entrance door to the playing area.

Shortly thereafter, Arellano Almazan saw two unknown males arrived at the park. One unknown male was approximately 35 years old, with light brown skin, dark short hair and a mustache, and was wearing a light color windbreaker jacket, blue jeans and white tennis shoes. The other unknown male was younger, but his face was not visible at the time because he wore a hooded beige sweatshirt with words written in the chest area, with brown sleeves and blue jeans. The two unknown males entered the playing area and went directly to the area where Aldama Perez and Hinojosa Ramos were talking. Without saying a word, the two unknown males began attacking Aldama Perez by kicking and punching him about his body.

When Aldama Perez tried to defend himself, one of the attackers sprayed him in his eyes with a substance and both attackers continued to beat him. Hinojosa Ramos yelled, "Leave him, leave him", and then left the scene. Arellano Almazan then noticed that one of the attackers ran after Hinojosa Ramos, while the other attacker continued to beat Aldama Perez. Aldama Perez began to stumble and fell to the ground, face up. The attacker then ran and left the scene. After the attackers left, Arellano Almazan and his friends tried to help Aldama Perez, but noticed that he was bleeding heavily from the chest. Arellano Almazan and his friends then began asking for help and called the police and ambulance.

After the police arrived, Arellano Almazan was asked to identify an individual who was detained inside the patrol car. He recognized one of the attackers who caused the death of Aldama Perez sitting in the patrol car. Jose Margarito Veliz Dominguez (hereinafter "Veliz Dominguez"), and Gabriel Lozano Rodriguez (hereinafter "Lozano Rodriguez"), also identified the individual in the patrol car as one of the attackers who caused the death of Aldama Perez.

3

The unknown male in the patrol car was later identified from police records as Erik Francisco Torres Moreno (hereinafter "Torres Moreno").

Veliz Dominguez and Lozano Rodriguez later provided sworn statements to the authorities that corroborated Arellano Almazan's account of the attack and the descriptions of the attackers. Specifically, Veliz Dominguez and Lozano Rodriguez gave the same description of the attackers, and Veliz Dominguez further stated that one of the attackers held a knife in his hand during the attack. Veliz Dominguez was unable to identify which attacker held the knife since both of them surrounded Aldama Perez during the attack. On November 10, 2011, and November 14, 2011, the Mexican authorities conducted identification proceedings where Veliz Dominguez and Lozano Rodriguez both identified an individual pictured in number three of a photo array as the other attacker who caused the death of Aldama Perez. Police records indicate that the individual pictured in number three of both photo arrays is RAMOS LUCERO.

On January 3, 2006, Roxana Adelina Hinojosa Ramos, in a sworn statement given to the Public Prosecutor for Investigations, stated that on January 2, 2006, she agreed to meet and talk with Aldama Perez, her ex-boyfriend, at the playing area of the park located between Diamante and Mexico Streets in Ensenada, Baja California. Hinojosa Ramos and Aldama Perez had known each other for over two years and were the parents of a 14 month old son. Hinojosa Ramos ended the relationship because Aldama Perez was unfaithful. On that day, Hinojosa Ramos met Aldama Perez at the park because he wanted to reconcile the relationship. When Hinojosa Ramos rejected his proposal, Aldama Perez began to yell and behave rudely and accused her of being involved with another man. Hinojosa Ramos then decided to leave the area,

4

and when she was approximately 20 meters away she heard Aldama Perez screaming, "Help me Roxana."

When Hinojosa Ramos turned to see what was happening, she saw a person running from the playing area towards Diamante Street. Immediately thereafter, Hinojosa Ramos recognized the person to be her half-brother, RAMOS LUCERO. Hinojosa Ramos asked RAMOS LUCERO what he had done to Aldama Perez and he replied, "No, nothing happened, I only hit him." When Hinojosa Ramos demanded an answer to why Aldama Perez had been attacked, RAMOS LUCERO replied, "Because he deserved it, because he was too much of an asshole. Let's go, and you don't know anything. You haven't seen me, and I am dead."

Hinojosa Ramos further stated that on one occasion, RAMOS LUCERO threatened to kill Aldama Perez. On another occasion Hinojosa was talking with Aldama Perez on the phone and they began to argue. RAMOS LUCERO heard the argument and grabbed the phone and told Aldama Perez, "Calm down man, stop fucking around. If the chick doesn't want you any more, fucking leave her or else I'm going to fuck you up." RAMOS LUCERO then hung up the phone. During the interview, Hinojosa was shown a beige hooded sweatshirt with brown sleeves with the words "South Pole Authentic Denim Company" written in the chest area that was recovered by the Police near the crime scene. Hinojosa Ramos identified the hooded sweatshirt as the one worn by her half-brother RAMOS LUCERO on January 2, 2006, when she saw him at the park located at Diamante and Mexico Streets. Hinojosa Ramos further described RAMOS LUCERO as a very violent man who abused drugs, and that he had recently been released from prison after serving eight months for stealing a car.

5

On January 3, 2006, an autopsy was performed on the body of Aldama Perez by the forensic doctors from the Legal Medical Service of the Supreme Court of Justice of the State of Baja California, Mexico. The autopsy report concluded that Aldama Perez' cause of death was fatal wounds caused by a bladed weapon penetrating the thorax and abdomen. Finally, the incident report prepared by the Ministerial Police of the State of Baja California, dated January 3, 2006, states that while officers were conducting a walkthrough of the crime scene, they observed a bloody knife on the ground and a two-toned brown hooded sweatshirt.

6.   Homicide is an extraditable offense under Article 2, paragraph 1 of the Extradition Treaty between the United States and Mexico, and item 1 of the Treaty's appendix.

7.   RAMOS LUCERO is a United States citizen, and was born on May 12, 1982. The photograph of RAMOS LUCERO identified by the witnesses has been provided by the Government of Mexico.

8.   RAMOS LUCERO is incarcerated in the United States at Cumberland Federal Correctional Institution in Cumberland, Maryland, for a firearm conviction with a possible parole date of October 2019. The United States Marshals Service has detailed location information.

9.   Because disclosure of the existence of this complaint and the requested warrant may cause RAMOS LUCERO to flee if released, or may put the arresting officers in greater danger, the undersigned complainant requests that this complaint and the requested warrant be placed UNDER SEAL until the arrest of RAMOS LUCERO, or until further order of the Court.

WHEREFORE, the undersigned complainant requests that a warrant for the arrest of LEONARDO RAMOS LUCERO be issued in accordance with 18 U.S.C. § 3184 and the

14 - 1 0 0 9 BPG

Extradition Treaty between the United States and Mexico; and that, upon such hearing as is required by federal law, if the Court deems the evidence sufficient under the provisions of the treaty to sustain the charges for which extradition is sought, the Court certify the same to the Secretary of State so that a warrant may be issued for the surrender of LEONARDO RAMOS LUCERO to the appropriate authorities of Mexico.  The United States also requests that the Court take such other actions as may be required under the provisions of the treaty and the laws of the United States.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Assistant United States Attorney


SWORN TO before me and subscribed in my presence this 28TH day of April, 2014, in the District of Maryland, Northern Division.

_____
United States Magistrate Judge

_____

7

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND NORTHERN DIVISION

IN THE MATTER OF THE          )        Filed Under Seal
EXTRADITION OF:               )
                             )        Magistrate No. 14 - 1 0 0 9 BPG
LEONARDO RAMOS LUCERO,        )
                             )
                             )
_____)

## O R D E R

BEFORE ME, a United States Magistrate Judge for the District of Maryland, Northern Division, personally appeared Assistant United States Attorney Judson T. Mihok, the complainant herein, whose complaint made under oath in accordance with 18 U.S.C. § 3184 sets forth facts on the basis of which I find probable cause to believe that LEONARDO RAMOS LUCERO, (hereinafter "RAMOS LUCERO"), should be apprehended and brought before this Court to the end that the evidence of criminality may be heard and considered as provided in 18 U.S.C. § 3184, and the Extradition Treaty between the United States and Mexico.

IT IS THEREFORE ORDERED that a warrant for the arrest of RAMOS LUCERO be issued. The Court also ORDERS that the complaint, this order, and the arrest warrant be placed UNDER SEAL until the arrest of the defendant or further order of this Court.

DATED: April 28, 2014

_____
United States Magistrate Judge

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

T.I.A.S. No. 9656 (U.S. Treaty), 31 U.S.T. 5059 (U.S. Treaty), 1980 WL 309106 (U.S. Treaty)

UNITED STATES OF AMERICA

Mexico

**Extradition**

Treaty signed at Mexico City May 4, 1978;

Ratification advised by the Senate of the United States of America November 30, 1979;
Ratified by the President of the United States of America December 13, 1979;
Ratified by Mexico January 31, 1979;
Ratifications exchanged at Washington January 25, 1980;
Proclaimed by the President of the United States of America February 6, 1980;
Entered into force January 25, 1980.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

**A PROCLAMATION**

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED MEXICAN STATES

ARTICLE 1

Obligation to Extradite

ARTICLE 2

Extraditable Offenses

ARTICLE 3

Evidence Required

ARTICLE 4

Territorial Application

ARTICLE 5

Political and Military Offenses

ARTICLE 6

Non bis in idem

ARTICLE 7

Lapse of Time

EXHIBIT 1

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

ARTICLE 8

Capital Punishment

ARTICLE 9

Extradition of Nationals

ARTICLE 10

Extradition Procedures and Required Documents

ARTICLE 11

Provisional Arrest

ARTICLE 12

Additional Evidence

ARTICLE 13

Procedure

ARTICLE 14

Decision and Surrender

ARTICLE 15

Delayed Surrender

ARTICLE 16

Requests for extradition made by Third States

ARTICLE 17

Rule of Speciality

ARTICLE 18

Summary Extradition

ARTICLE 19

Surrender of Property

ARTICLE 20

Transit

ARTICLE 21

Expenses

ARTICLE 22

Scope of Application

ARTICLE 23

Ratification, Entry into Force, Denunciation

APPENDIX

## BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

*1 The Extradition Treaty between the United States of America and the United Mexican States was signed at Mexico City on May 4, 1978, the text of which, in the English and Spanish languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 30, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 13, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of the United Mexican States;

It is provided in Article 23 of the Treaty that the Treaty shall enter into force on the date of exchange of the instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on January 25, 1980; and accordingly the Treaty entered into force on that date;

NOW, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, to the end that it be observed and fulfilled with good faith on and after January 25, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed. DONE at the city of Washington this sixth day of February in the year of our Lord one thousand nine hundred eighty and of the Independence of the United States of America the two hundred fourth.

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

JIMMY CARTER
[SEAL]

By the President:

CYRUS VANCE
*Secretary of State*

## EXTRADITION TREATY BETWEEN THE UNITED STATES
## OF AMERICA AND THE UNITED MEXICAN STATES

The Government of the United States of America and the Government of the United Mexican States;

Desiring to cooperate more closely in the fight against crime and, to this end, to mutually render better assistance in matters of extradition;

Have agreed as follows:

### ARTICLE 1

#### Obligation to Extradite

1.- The Contracting Parties agree to mutually extradite, subject to the provisions of this Treaty, persons who the competent authorities of the requesting Party have charged with an offense or have found guilty of committing an offense, or are wanted by said authorities to complete a judicially pronounced penalty of deprivation of liberty for an offense committed within the territory of the requesting Party.

2.- For an offense committed outside the territory of the requesting Party, the requested Party shall grant extradition if:
   a) its laws would provide for the punishment of such an offense committed in similar circumstances, or

   b) the person sought is a national of the requesting Party, and that Party has jurisdiction under its own laws to try that person.

### ARTICLE 2

#### Extraditable Offenses

1.- Extradition shall take place, subject to this Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year.

2.- If extradition is requested for the execution of a sentence, there shall be the additional requirement that the part of the sentence remaining to be served shall not be less than six months.

3.- Extradition shall also be granted for wilful acts which, although not being included in the Appendix, are punishable, in accordance with the federal laws of both Contracting Parties, by a deprivation of liberty the maximum of which shall not be less than one year.

4.- Subject to the conditions established in paragraphs 1, 2 and 3, extradition shall also be granted:
   a) For the attempt to commit an offense; conspiracy to commit an offense; or the participation in the execution of an offense; or

b) When, for the purpose of granting jurisdiction to the United States government, transportation of persons or property, the use of the mail or other means of carrying out interstate or foreign commerce, is also an element of the offense.

### ARTICLE 3

#### Evidence Required

Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party.

### ARTICLE 4

#### Territorial Application

1.- For the purposes of this Treaty, the territory of a Contracting Party shall include all the territory under the jurisdiction of that Contracting Party, including airspace and territorial waters and vessels and aircraft registered in that Contracting Party if any such aircraft is in flight when the offense is committed.

2.- For the purposes of this Treaty, an aircraft shall be considered to be in flight at any time from the moment when all its external doors are closed following the embarkation until the moment when any such door is opened for disembarkation.

### ARTICLE 5

#### Politicial and Military Offenses

1.- Extradition shall not be granted when the offense for which it is requested is political or of a political character.

If any question arises as to the application of the foregoing paragraph, the Executive authority of the requested Party shall decide.

2.- For the purpose of this Treaty, the following offenses shall not be considered to be offenses included in paragraph 1:
   a) The murder or other wilful crime against the life or physical integrity of a Head of State or Head of Government or of his family, including attempts to commit such an offense.

   b) An offense which the Contracting Parties may have the obligation to prosecute by reason of a multilateral international agreement.

3.- Extradition shall not be granted when the offense for which extradition is requested is a purely military offense.

### ARTICLE 6

#### Non bis in idem

Extradition shall not be granted when the person sought has been prosecuted or has been tried and convicted or acquitted by the requested Party for the offense for which extradition is requested.

## ARTICLE 7

### Lapse of Time

Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.

## ARTICLE 8

### Capital Punishment

When the offense for which extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

## ARTICLE 9

### Extradition of Nationals

1.- Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

2.- If extradition is not granted pursuant to paragraph 1 of this Article, the requested Party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense.

## ARTICLE 10

### Extradition Procedures and Required Documents

1.- The request for extradition shall be made through the diplomatic channel.

2.- The request for extradition shall contain the description of the offense for which extradition is requested and shall be accompanied by:
   a) A statement of the facts of the case;

   b) The text of the legal provisions describing the essential elements of the offense;

   c) The text of the legal provisions describing the punishment for the offense;

   d) The text of the legal provisions relating to the time limit on the prosecution or the execution of the punishment of the offense;

   e) The facts and personal information of the person sought which will permit his identification and, where possible, information concerning his location.

3.- In addition, when the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by:
   a) A certified copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party;

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

b) Evidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there.

4.- When the request for extradition relates to a convicted person, it shall be accompanied by a certified copy of the judgment of conviction imposed by a court of the requesting Party.

If the person was found guilty but not sentenced, the extradition request shall be accompanied by a certification to that effect and a certified copy of the warrant of arrest.

If such person has already been sentenced, the request for extradition shall be accompanied by a certification of the sentence imposed and a statement indicating which part of the sentence has not been carried out.

5.- All the documents that must be presented by the requesting Party in accordance with the provisions of this Treaty shall be accompanied by a translation in the language of the requested Party.

6.- The documents which, according to this Article, shall accompany the request for extradition, shall be received in evidence when:

a) In the case of a request emanating from the United States, they are authenticated by the official seal of the Department of State and legalized by the manner prescribed by the Mexican law;

b) In the case of a request emanating from the United Mexican States, they are certified by the principle diplomatic or consular officer of the United States in Mexico.

## ARTICLE 11

### Provisional Arrest

1.- In the case of urgency, either Contracting Party may request, through the diplomatic channel, the provisional arrest of an accused or convicted person. The application shall contain a description of the offense for which the extradition is requested, a description of the person sought and his whereabouts, an undertaking to formalize the request for extradition, and a declaration of the existence of a warrant of arrest issued by a competent judicial authority or a judgment of conviction issued against the person sought.

2.- On receipt of such a request, the requested Party shall take the necessary steps to secure the arrest of the person claimed.

3.- Provisional arrest shall be terminated if, within a period of 60 days after the apprehension of the person claimed, the executive authority of the requested Party has not received the formal request for extradition and the documents mentioned in Article 10.

4.- The fact that the provisional arrest is terminated pursuant to paragraph 3 shall not prejudice the extradition of the person sought if the request for extradition and the necessary documents mentioned in Article 10 are delivered at a later date.

## ARTICLE 12

### Additional Evidence

If the Executive authority of the requested Party considers that the evidence furnished in support of the request for extradition is not sufficient in order to fulfill the requirements of this Treaty, that Party shall request the presentation of the necessary additional evidence.

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

## ARTICLE 13

### Procedure

1.- The request for extradition shall be processed in accordance with the legislation of the requested Party.

2.- The requested Party shall make all arrangements necessary for internal procedures arising out of the request for extradition.

3.- The competent legal authorities of the requested Party shall be authorized to employ all legal means within their power to obtain from the judicial authorities the decisions necessary for the resolution of the request for extradition.

## ARTICLE 14

### Decision and Surrender

1.- The requested Party shall promptly communicate to the requesting Party its decision on the request for extradition.

2.- In the case of complete or partial rejection of a request for extradition, the requested Party shall give the reasons on which it was based.

3.- If the extradition is granted, the surrender of the person sought shall take place within such time as may be prescribed by the laws of the requested Party. The competent authorities of the Contracting Parties shall agree on the date and place of the surrender of the person sought.

4.- If the competent authority has issued the warrant or order for the extradition of the person sought and he is not removed from the territory of the requested Party within the prescribed period, he shall be set at liberty and the requested Party may subsequently refuse to extradite him for the same offense.

## ARTICLE 15

### Delayed Surrender

The requested Party, after granting the extradition, may defer the surrender of the person sought when that person is being proceeded against or is serving a sentence in the territory of the requested Party for a different offense, until the conclusion of the proceeding or the full execution of the punishment that has been imposed.

## ARTICLE 16

### Requests for extradition made by Third States

The requested Party, in the case of receiving requests from the other Contracting Party and from one or more third States for the extradition of the same person, be it for the same offense or for different offenses, shall decide to which requesting State it shall grant the extradition of that person.

## ARTICLE 17

### Rule of Speciality

1.- A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted nor be extradited by that Party to a third State unless:

   a) He has left the territory of the requesting Party after his extradition and has voluntarily returned to it;

b) He has not left the territory of the requesting Party within 60 days after being free to do so; or

c) The requested Party has given its consent to his detention, trial, punishment or extradition to a third State for an offense other than that for which the extradition was granted.

These stipulations shall not apply to offenses committed after the extradition.

2.- If, in the course of the procedure, the classification of the offense is changed for which the person requested was extradited, he shall be tried and sentenced on the condition that the offense, in its new legal form:
a) Is based on the same group of facts established in the request for extradition and in the documents presented in its support; and

b) Is punishable with the same maximum sentence as the crime for which he was extradited or with a lesser sentence.

## ARTICLE 18

### Summary Extradition

If the person sought informs the competent authorities of the requested Party that he agrees to be extradited, that Party may grant his extradition without further proceedings, and shall take all measures permitted under its laws to expedite the extradition. In such cases Article 17 shall not be applicable.

## ARTICLE 19

### Surrender of Property

1.- To the extent permitted under the law of the requested Party and subject to the rights of third parties, which shall be duly respected, all articles, instruments, objects of value or documents relating to the offense, whether or not used for its execution, or which in any other manner may be material evidence for the prosecution, shall be surrendered upon the granting of the extradition even when extradition cannot be effected due to the death, disappearance, or escape of the accused.

2.- The requested Party may condition the surrender of articles upon a satisfactory assurance from the requesting Party that the articles will be returned to the requested Party as soon as possible.

## ARTICLE 20

### Transit

1.- The right to transport through the territory of one of the Contracting Parties a person who is not a national of that Contracting Party surrendered to the other Contracting Party by a third State shall be granted on presentation made through the diplomatic channel of a certified copy of the decision on extradition, provided that reasons of public order are not opposed to the transit.

2.- The authorities of the transit State shall be in charge of the custody of the extradited person while that person is in its territory.

3.- The Party to which the person has been extradited shall reimburse the State through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

## ARTICLE 21

### Expenses

The requested Party shall bear the expenses of the arrangements referred to in Article 13, with the exception that the expenses incurred for the translation of documents and, if applicable, for the transportation of the person ordered extradited shall be paid by the requesting Party.

## ARTICLE 22

### Scope of Application

1.- This Treaty shall apply to offenses specified in Article 2 committed before and after this Treaty enters into force.

2.- Requests for extradition that are under process on the date of the entry into force of this Treaty, shall be resolved in accordance with the provisions of the Treaty of 22 February, 1899, [1] and the Additional Conventions on Extradition of 25 June 1902, [2] 23 December 1925, [3] and 16 August 1939. [4]

## ARTICLE 23

### Ratification, Entry into Force, Denunciation

1.- This Treaty shall be subject to ratification; the exchange of instruments of ratification shall take place in Washington as soon as possible.

2.- This Treaty shall enter into force on the date of exchange of the instruments of ratification.

3.- On entry into force of this Treaty, the Treaty of Extradition of 22 February 1899 and the Additional Conventions on Extradition of 25 June 1902, 23 December 1925 and 16 August 1939 between the United States of America and the United Mexican States, shall cease to have effect without prejudice to the provisions of Article 22.

4.- Either Contracting Party may terminate this Treaty by giving notice to the other Party. The termination shall take effect six months after the receipt of such notice.

Done in two originals, in the English and Spanish languages, both equally authentic, at Mexico City this fourth day of May, one thousand nine hundred seventy-eight.

Cyrus Vance.
(Signature)

**For the Government of the United States of America**
S. Roel.
(Signature)

**For the Government of the United Mexican States**

### APPENDIX

1. Murder or manslaughter; abortion.

2. Malicious wounding or injury.

3. Abandonment of minors or other dependents when there is danger of injury or death.

4. Kidnapping; child stealing; abduction; false imprisonment.

5. Rape; statutory rape; indecent assault; corruption of minors, including unlawful sexual acts with or upon children under the age of consent.

6. Procuration; promoting or facilitating prostitution.

7. Robbery; burglary; larceny.

8. Fraud.

9. Embezzlement.

10. An offense against the laws relating to counterfeiting and forgery.

11. Extortion.

12. Receiving or transporting any money, valuable securities, or other property knowing the same to have been unlawfully obtained.

13. Arson; malicious injury to property.

14. Offenses against the laws relating to the traffic in, possession, production, manufacture, importation or exportation of dangerous drugs and chemicals, including narcotic drugs, cannabis, psychotropic drugs, opium, cocaine, or their derivatives.

15. Offenses against the laws relating to the control of poisonous chemicals or substances injurious to health.

16. Piracy.

17. Offenses against the safety of means of transportation including any act that would endanger a person in a means of transportation.

18. An offense relating to unlawful seizure or exercise of control of trains, aircraft, vessels, or other means of transportation.

19. Offenses against the laws relating to prohibited weapons, and the control of firearms, ammunition, explosives, incendiary devices or nuclear materials.

20. An offense against the laws relating to international trade and transfers of funds or valuable metals.

21. An offense against the laws relating to the importation, exportation, or international transit of goods, articles, or merchandise, including historical or archeological items.

22. Violations of the customs laws.

23. Offenses against the laws relating to the control of companies, banking institutions, or other corporations.

Treaty signed at Mexico City May 4, 1978;, T.I.A.S. No. 9656 (1980)

24. Offenses against the laws relating to the sale of securities, including stocks, bonds and instruments of credit.

25. Offenses against the laws relating to bankruptcy or rehabilitation of a corporation.

26. Offenses against the laws relating to prohibition of monopoly or unfair transactions.

27. Offenses against the laws relating to protection of industrial property or copyright.

28. Offenses against the laws relating to abuse of official authority.

29. Bribery, including soliciting, offering and accepting bribes.

30. Perjury; false statements to any governmental authority. Subornation of perjury or false statements.

31. Offenses against the laws relating to obstruction of justice, including harboring criminals and suppressing evidence.


Footnotes
1       TS 242; 31 Stat. 1818.
2       TS 421; 9 Bevans 918.
3       TS 741; 44 Stat. 2409.
4       TS 967; 55 Stat. 1133.

T.I.A.S. No. 9656

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# UNOFFICIAL TRANSLATION

05106

Washington, D.C., August 6, 2012

Madame Secretary:

On behalf of my Government, I have the honor to refer to the Extradition Treaty signed between the United Mexican States and the United States of America, and to petition number 00994, dated February 21, 2011, regarding the provisional arrest for international extradition purposes of **LEONARDO RAMOS LUCERO,** who is wanted by Mexican authorities for his alleged commission of the crime of **AGGRAVATED HOMICIDE** *(HOMICIDIO CALIFICADO).*

In this regard, on behalf of my Government, and on the basis of Article 2 and, in particular, Article 10 of the Extradition Treaty, I hereby present before Your Excellency's Government the **FORMAL INTERNATIONAL EXTRADITION REQUEST** of **LEONARDO RAMOS LUCERO.**

**LEONARDO RAMOS LUCERO** was arrested on October 25, 2011 and is in custody of authorities in Tulsa, Oklahoma, where he is facing weapons possession charges.

(ARREST WARRANT...)

To Her Excellency
Hillary Rodham Clinton
Secretary of State
Washington, D.C.

EXHIBIT 2

## ARREST WARRANT

On January 13, 2006, the Third Judge of First Instance for Criminal Matters of Ensenada, Baja California, issued an arrest warrant in criminal case number 04/2006 for **LEONARDO RAMOS LUCERO**, due to his alleged perpetration of the crime of **AGGRAVATED HOMICIDE** *(HOMICIDIO CALIFICADO)*. This crime is defined by Articles 147, 148, 150 and 151 of the Penal Code of the State of Baja California and sanctioned under Article 126 thereof. These legal provisions were in effect when the crime was committed.

## STATUTE OF LIMITATIONS

In a judicial ruling dated November 9, 2011, the Third Judge of First Instance for Criminal Matters of Ensenada, Baja California informed that the statute of limitations for the criminal case expires on January 14, 2041, thus the arrest warrant for **LEONARDO RAMOS LUCERO** is active and enforceable.

The conduct attributed to the accused, for which the arrest warrant was issued, is punishable under the laws of both countries with a maximum prison sentence of no less than one year, as established by Article 2, paragraph 1 of the Extradition Treaty between the United Mexican States and the United States of America, in relation to item 1 of the Treaty's Appendix.

The elements of proof which lead to the consideration that the accused is allegedly responsible for the crime, are based, among other things, upon the following:

## FACTS

On January 2, 2006, in the Municipality of Ensenada, Baja California, **LEONARDO RAMOS LUCERO** and Erik Francisco Torres Moreno caused the death of Klaus Michael Aldama Perez by inflicting deadly injuries to his chest and abdomen with a bladed object.

During the investigations conducted by the Attorney General's Office of the State of Baja California, a statement was taken from Francisco Geovani Arellano Almazan, who declared before the Public Prosecutor for Investigations that at around 8:20 p.m. on January 2, 2006, he went with his friends Jose Margarito Veliz Dominguez and Gabriel Lozano Rodriguez to play soccer at the park located between *Diamante* and *México* streets in Ensenada, Baja California. He noticed that a man and a woman were at this location. He later learned that they were Klaus Michael Aldama Perez and his former girlfriend Roxana Adelina Hinojosa Ramos. These persons walked into the playing area and began to talk there. The deponent added that he and his friends were able to see everything since they were sitting next to the entrance door to the playing area.

Francisco Geovani Arellano Almazan noticed that a few minutes later, two males arrived, who according to the police investigation were named **LEONARDO RAMOS LUCERO** and Erik Francisco Torres Moreno. These individuals entered the playing area and went directly to the spot where Klaus Michael Aldama Perez and Roxana Adelina Hinojosa Ramos were talking. Without saying a word, the individuals began attacking the victim, kicking him and punching him in different parts of his body. When Klaus Michael Aldama Perez had a chance to defend himself, **LEONARDO RAMOS LUCERO** and Erik Francisco Torres Moreno sprayed his eyes with a

substance and continued to beat him. Roxana Adelina Hinojosa Ramos yelled at them *"leave him, leave him"*, and then she left the scene.

Francisco Geovani Arellano Almazan, Jose Margarito Veliz Dominguez and Gabriel Lozano Rodriguez noticed that one of the individuals that was hitting Klaus Michael Aldama Perez ran after Roxana Adelina Hinojosa Ramos, while the other one continued to hit him. Francisco Geovani Arellano Almazan saw when Klaus Michael Aldama Perez began to stumble and fell to the floor face up. When· this happened, the attacker ran and left the scene. Once the attacker left, Francisco Geovani Arellano Almazan and his friends tried to help the victim but they saw he had a lot of blood on his chest, so they decided to ask for help and called the police and an ambulance.

Francisco Geovani Arellano Almazan stated that a short time after the facts took place, the police asked him to go see a person who was detained inside a patrol car. The deponent stated that when he saw this person he recognized him as one of the individuals who had participated in the attack that caused the death of Klaus Michael Aldama Perez.

Jose Margarito Veliz Dominguez and Gabriel Lozano Rodriguez both provided statements before the Public Prosecutor for Investigations and both corroborated what was stated by Francisco Geovani Arellano Almazan. They also identified Erik Francisco Torres Moreno when he was before them.

Jose Margarito Veliz Dominguez added that he was able to see that **LEONARDO RAMOS LUCERO** and Erik Francisco Torres Moreno were carrying a knife in their hand. However, he was unable to say which one was carrying it since both of them surrounded Klaus Michael Aldama Perez and beat him.

It should be noted that from the statements given by Francisco Geovani Arellano Almaza, Jose Margarito Veliz Dominguez and Gabriel Lozano Rodriguez it is known that the person who accompanied Erik Francisco Torres Moreno, who according to the police investigation is named **LEONARDO RAMOS LUCERO**, wore a brown and beige hooded sweatshirt.

On January 3, 2006, Roxana Adelina Hinojosa Ramos stated before the Public Prosecutor for Investigations that on January 2, 2006 she had agreed to meet and talk with Klaus Michael Aldama Perez at the playing area of the park located between *Diamante* and *México* streets in Ensenada, Baja California because he was her ex-boyfriend,. The deponent stated that the victim was interested in living with her again and asked her for another chance. However, when she rejected his proposals Klaus Michael Aldama Perez began to yell at her and to behave rudely. He told her that surely she already had another boyfriend and for that reason she did not want to go back to him. Roxana Adeline decided to leave the scene and when she was about 20 meters away she heard Klaus Michael Aldama Perez screaming and saying *"help me Roxana"*. When she turned, she saw a person running from the playing area towards *Diamante* street. Immediately thereafter, she saw her brother **LEONARDO RAMOS LUCERO**. The deponent asked the accused if he had done something to Klaus Michael Aldama Perez and he replied "no, nothing·happened, I only hit him". When Roxana Adelina Hinojosa Ramos insisted upon knowing why he had beaten the victim, **LEONARDO RAMOS LUCERO** replied *"because he deserved it, because he was too much of an asshole, let's go and you don't know anything, you haven't seen me and I am dead"*.

Roxana Adelina Hinojosa Ramos stated that on one occasion, when she was talking on the phone with Klaus Michael Aldama Perez, they began to argue. **LEONARDO RAMOS LUCERO** heard the argument, approached her, grabbed the phone and told Klaus Michael Aldama Perez *"calm down man, stop fucking around, if the chick doesn't want you any more fucking leave her, or else I'm going to fuck you up."* He then hung up the phone.

The certification report of the body of Klaus Michael Aldama Perez conducted on January 2, 2006 identifies the place and position in which the body was found as well as the presence of four wounds caused by a bladed weapon.

The autopsy performed on the body of Klaus Michael Aldama Perez on January 3, 2006 by expert forensic doctors attached to the Legal Medical Service of the Supreme Court of Justice of the State of Baja California concluded that the cause of death was fatal wounds caused by a bladed weapon penetrating the thorax and abdomen.

Lastly, the report issued by the Ministerial Police of the State of Baja California, dated January 3, 2006, states that while conducting a walkthrough around the scene of the crime, officers noticed a bloody knife on the floor and a two-toned brown hooded sweatshirt.

On November 10, 2011 and November 14, 2011, the Public Prosecutor assigned to the Investigations Unit of the Attorney General's Office of Baja California conducted identification proceedings with Jose Margarito Veliz Dominguez and Gabriel Lozano Rodriguez, both of whom identified the person appearing in photograph number 3 of the photo array placed before them as **LEONARDO RAMOS LUCERO**, the person who took the life of Klaus Michael Aldama Perez.

In compliance with Articles 3, 10(3)(a), 10(3)(b), 5 and 6(b) of the Extradition Treaty signed between the United Mexican States and the United States of America, legalized and sworn copies of the following are attached herewith, along with English translations:

## EVIDENCE

I.  Sworn statement by Ernesto Nava Rivera, Federal Public Prosecutor assigned to the General Directorate of Extraditions and Legal Assistance of Federal Attorney General's Office, in which he states, among other things, that he is familiar with the proceedings against **LEONARDO RAMOS LUCERO**. In addition, he explains the charges against the accused and the laws applicable to the process being pursued against him, provides a summary of the facts and describes the evidence that prove the alleged crime.

**Exhibit 1.** Arrest warrant issued on January 13, 2006 by the Judge of First Instance for Criminal Matters of Ensenada, Baja California against **LEONARDO RAMOS LUCERO**, due to his alleged perpetration of the crime of **AGGRAVATED HOMICIDE** *(HOMICIDIO CALIFICADO)*.

**Exhibit 2.** Texts containing the legal provisions regarding the elements constituting the crime, the penalty to be imposed and the statute of limitations.

**Exhibit 3.** Judicial order dated November 9, 2011, in which the Judge of First Instance for

4

Criminal Matters of Ensenada, Baja California determined that the statute of limitations expires on January 14, 2041, thus the arrest warrant for **LEONARDO RAMOS LUCERO** is active and enforceable.

**Exhibit 4.** Statement given by the witness Francisco Geovany Arellano Almazan on January 3, 2006.

**Exhibit 5.** Statement given by the witness Jose Margarito Veliz Dominguez on January 3, 2006.

**Exhibit 6.** Statement given by the witness Gabriel Lozano Rodriguez on January 3, 2006.

**Exhibit 7.** Statement given by the witness Roxana Adelina Hinojosa Ramos on January 3, 2006.

**Exhibit 8.** Certification report of the body of Klaus Michael Aldama Perez conducted on January 2, 2006 by the Public Prosecutor for Investigations of Crimes Against Life and Health of the Attorney General's Office of the State of Baja California.

**Exhibit 9.** Autopsy report of the body of Klaus Michael Aldama Perez dated January 3, 2006, conducted by expert forensic doctors of the Supreme Court of Justice of the State of Baja California.

**Exhibit 10.** Investigation report dated January 3, 2006, issued by the ministerial police assigned to the Attorney General's Office of the State of Baja California.

**Exhibit 11.** Identification proceedings conducted by the witness Jose Margarito Veliz Dominguez on November 10, 2011 before the Public Prosecutor assigned to the Investigations Unit of the Attorney General's Office of Baja California, in which he identified **LEONARDO RAMOS LUCERO** in the photo array placed before him.

**Exhibit 12.** Identification proceedings conducted by the witness Gabriel Lozano Rodriguez on November 10, 2011 before the Public Prosecutor assigned to the Investigations Unit of the Attorney General's Office of Baja California, in which he identified **LEONARDO RAMOS LUCERO** in the photo array placed before him.

The elements of proof, as well as the legal provisions and procedures mentioned above, have been duly certified, legalized and sworn, and are hereby attached with their corresponding translation into the English language, in accordance with Article 10, section b) paragraphs 5 and 6 of the Extradition Treaty between the United Mexican States and the United States of America.

## GENERAL PERSONAL DATA

In compliance with Article 10, paragraph 2, section e) of the Extradition Treaty signed between the United Mexican States and the United States of America, upon which this request is based, the following are the general personal data available on the accused:

| | |
|---|---|
| Name | **LEONARDO RAMOS LUCERO** |
| Date of Birth | May 12, 1982 |

| | |
|---|---|
| Nationality | US citizen |
| Originally from | Ensenada, Baja California |
| Father | Francisco Ramos Lopez |
| Mother | Susana Lucero Flores |

In compliance with Article 19 of the Extradition Treaty signed between the United Mexican States and the United States of America, the Mexican government requests the confiscation and surrender of all items, instruments, and objects of value, or any documents related to the crime, even if they were not used to carry out said crime, that were in the possession of the accused, JOSE LEONARDO RAMOS LUCERO at the time of his arrest, or at a later date, which could be used as evidence within the criminal investigation being carried out against him.

Based on the above, I am enclosing in a duly legalized package, along with translations into English, the documents that indicate, apart from the crimes of which the accused is charged, the elements of said crimes, the place, time and circumstances in which the crimes were committed, and the information resulting from the criminal proceedings instituted by Mexican authorities to prove the crime and to determine the alleged culpability of LEONARDO RAMOS LUCERO. The package, which also includes the arrest warrant for this person, is submitted to Your Excellency as the true information that it is.

In light of the above, Madame Secretary, and since this petition satisfies the conditions described in the Extradition Treaty currently in force between our two countries and, to the best of my knowledge, also satisfies the internal procedures of the Mexican State as well as the procedures established by the Extradition Treaty to process this FORMAL INTERNATIONAL EXTRADITION REQUEST, I hereby request Your Excellency's kind mediation so as to secure from the competent U.S. authorities, including the judicial ones, the extradition of LEONARDO RAMOS LUCERO from the United States to Mexico.

I thank you in advance for Your Excellency's valuable assistance concerning this matter. I avail myself of this opportunity to renew to Your Excellency the assurances of my highest and most distinguished consideration.

Arturo Sarukhan
Ambassador

6